741 F.2d 524
 Fed. Sec. L. Rep. P 91,663, 3 Fed.R.Serv.3d 1284
 Aaron J. FURMAN, Alvin Katz, Francis P. Maglio, Martin J.
Joel, Jr., Harvey Sheid, Everard M.C. Stamm,
Robert C. Stamm, Plaintiffs,
Martin J. Joel, Jr., Harvey Sheid, Everard M.C. Stamm,
Robert C. Stamm, Plaintiffs-Appellants,
v.
John CIRRITO, Harold S. Coleman, John A. Miller, Francis G.
Rea, Peter M. Toczek, A.J. Yorke, Defendants-Appellees.
 No. 1261, Docket 84-7113.
 United States Court of Appeals,
Second Circuit.
 Argued May 16, 1984.
Decided July 27, 1984.
 
 Seymour Shainswit, New York City (Melanie L. Golden, Kronish, Lieb, Shainswit, Weiner & Hellman, New York City, of counsel), for plaintiffs-appellants.
 Max Gitter, New York City (William P. Farley, Paul, Weiss, Rifkind, Wharton & Garrison, New York City, of counsel), for defendants-appellees.
 Before CARDAMONE, PRATT, JJ., and DANIEL M. FRIEDMAN, of the United States Court of Appeals for the Federal Circuit, sitting by designation, Circuit Judges.
 GEORGE C. PRATT, Circuit Judge.
 
 
 1
 The main issue on this appeal is one of considerable importance in view of the rapidly growing number of civil actions based on 18 U.S.C. Sec. 1964(c), commonly known as "civil RICO". That issue is whether a plaintiff, in order to state a claim under Sec. 1964(c), must allege a "separate, distinct racketeering enterprise injury", above and beyond the injury caused by the predicate acts of racketeering activity. Noting that the damage allegations in plaintiffs' RICO cause of action were identical to those in their common law fraud claims, the district court, 578 F.Supp. 1535, concluded that no "separate, distinct racketeering enterprise injury" had been alleged, that the RICO claim was therefore legally deficient, and, there being no other basis for federal jurisdiction, that the complaint should be dismissed. Although this panel concludes that neither the language of the statute nor its legislative history imposes such a requirement, we are compelled to affirm the district court's judgment based on the two recently filed, controlling opinions in this court: Sedima, S.P.R.L. v. Imrex Co., 741 F.2d 482 (2d Cir.1984), and Bankers Trust Co. v. Rhoades, 741 F.2d 511 (2d Cir.1984). Both of these cases were argued before the case now before us. The filings of the opinions in all three cases were held up pending a vote by the entire court on a request made within the court for in banc consideration of all three cases. When the in banc request was denied, the opinions were filed, by agreement of the court, in the order in which they were completed. We publish this opinion to express our disagreement with the majority views of the panels in those two cases and to reaffirm the views expressed by Judge Cardamone in his dissents in Sedima, S.P.R.L., and Bankers Trust Co. This opinion will also serve as a record of the dissents by Judge Cardamone and Judge Pratt to this circuit's denial of in banc consideration to Sedima, S.P.R.L., Bankers Trust Co., and the instant case. Without necessarily accepting the rationale of this opinion, Judge Winter also dissents from the denial of in banc consideration.
 
 BACKGROUND
 
 2
 This lawsuit arises out of the sale of the brokerage firm of Bruns, Nordeman, Rea & Co. ("Bruns") to Bache, Halsey, Stewart, Shields, Inc. ("Bache"). Plaintiffs and defendants were all general partners of Bruns. Defendants Rea and Coleman were the managing directors of Bruns; the other defendants, along with Rea and Coleman, comprised the executive committee which formulated Bruns's policies, exercised exclusive control over its affairs, and negotiated the sale to Bache.
 
 
 3
 Plaintiffs allege that until it was too late in the sale negotiations to help them, defendants did not reveal that Bache had refused to complete the sale unless each partner of Bruns, including the plaintiffs, signed the purchase agreement; that defendants Rea and Coleman made payments, in the form of severance pay, to the other members of the executive committee in order to induce certain misrepresentations to plaintiffs; that defendants negotiated for themselves "sweetheart" employment arrangements with Bache, simultaneously misrepresenting to plaintiffs that these arrangements could not be altered; and that defendants made no effort to explore the merits of another offer to buy Bruns.
 
 
 4
 The complaint sets forth three causes of action, two of which are pendent state law claims based on common law fraud and breach of fiduciary duty. The civil RICO claim asserts that Bruns constituted an "enterprise" under 18 U.S.C. Sec. 1961(4); that by virtue of their positions defendants "conducted and participated in the affairs" of Bruns within the meaning of Sec. 1962(c); that defendants engaged in a fraudulent scheme of misrepresentations and concealments during their negotiations with Bache; that defendants conducted Bruns's affairs through "a pattern of racketeering activity", as that term is used in Sec. 1962(c); and that, as part of the pattern of racketeering activity and in furtherance of the fraudulent scheme, defendants committed the predicate acts of using mail and wire facilities in violation of 18 U.S.C. Secs. 1341 and 1343.
 
 
 5
 Plaintiffs allege "injury in their business and property" in that (1) had they been aware from the beginning that their consent was necessary to consummate the sale to Bache, they would have been able to bargain for and receive sums comparable to those received by members of the executive committee from Rea and Coleman; (2) these payments caused the committee members receiving them to refrain from seeking a higher price from an alternate purchaser; (3) had defendants negotiated in good faith on behalf of all the partners, instead of just themselves, each plaintiff could have obtained employment arrangements superior to those that they actually received; and (4) the consideration Bache paid to the partnership was substantially reduced, because Bache absorbed the cost of funding the lucrative employment arrangements negotiated by defendants for themselves. Plaintiffs seek the treble damages and attorney's fees authorized by 18 U.S.C. Sec. 1964(c).
 
 
 6
 Defendants moved in the district court to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief can be granted. Alternatively, they sought an order compelling plaintiffs to arbitrate the controversy as provided in the partnership agreement. The district court rejected most of defendants' arguments: it concluded that, on the allegations of the complaint, Bruns was an "enterprise", that the sale to Bache was part of the "affairs" of the enterprise, and that defendants had engaged in a "pattern of racketeering activity", all within the meaning of those terms in the RICO statute. However, on the sole ground that plaintiffs were required, but failed, to allege "a separate, distinct racketeering enterprise injury", the district court dismissed the complaint. It did not reach the arbitration question.
 
 
 7
 On appeal, therefore, we are presented with the narrow issue of whether, in order to state a claim under Sec. 1964(c), a plaintiff must allege "a separate, distinct racketeering enterprise injury". We are not considering whether plaintiffs must allege a connection to organized crime, cf. Moss v. Morgan Stanley, 719 F.2d 5, 21 (2d Cir.1983), cert. denied, --- U.S. ----, 104 S.Ct. 1280, 79 L.Ed.2d 684 (1984), whether plaintiffs must show some "competitive injury" as a result of defendants' actions, cf. Schacht v. Brown, 711 F.2d 1343, 1356-58 (7th Cir.), cert. denied, --- U.S. ----, 104 S.Ct. 508, 78 L.Ed.2d 698 (1983); Bennett v. Berg, 685 F.2d 1053, 1059 (8th Cir.1982), aff'd in part and rev'd in part on other grounds, 710 F.2d 1361 (en banc), cert. denied, --- U.S. ----, 104 S.Ct. 527, 78 L.Ed.2d 710 (1983), or whether the statute requires a criminal conviction of the predicate offenses, or of a RICO offense, before a civil RICO claim can be maintained, see Sedima, S.P.R.L. v. Imrex Co., at 497; cf. USACO Coal Co. v. Carbomin Energy, Inc., 689 F.2d 94, 95 n. 1 (6th Cir.1982); Farmers Bank of Delaware v. Bell Mortgage Corp., 452 F.Supp. 1278, 1280 (D.Del.1978).
 
 DISCUSSION
 
 8
 In 1970 congress enacted the Organized Crime Control Act, Pub.L. No. 91-452, 84 Stat. 941. Title IX thereof, codified at 18 U.S.C. Secs. 1961-68, is entitled "Racketeer Influenced and Corrupt Organization Act" (RICO) and prescribes criminal penalties, 18 U.S.C. Sec. 1963, as well as civil remedies, 18 U.S.C. Sec. 1964, for violation of its substantive provisions, 18 U.S.C. Sec. 1962. The case before us concerns the private civil remedies under Sec. 1964(c), particularly treble damages and attorney's fees.
 
 
 9
 Our analysis must begin with the statutory language. Lewis v. United States, 445 U.S. 55, 60, 100 S.Ct. 915, 918, 63 L.Ed.2d 198 (1980). If unambiguous that language controls, absent "clearly expressed legislative intent to the contrary". United States v. Turkette, 452 U.S. 576, 580, 101 S.Ct. 2524, 2527, 69 L.Ed.2d 246 (1981) (quoting Consumer Product Safety Commission v. GTE Sylvania, Inc., 447 U.S. 102, 100 S.Ct. 2051, 64 L.Ed.2d 766 (1980)). Further, in construing this statute we should keep in mind that congress intended that its provisions "shall be liberally construed to effectuate its remedial purposes." Pub.L. No. 91-452, Sec. 904(a), 84 Stat. 947 (1970); see also United States v. Turkette, 452 U.S. at 587, 101 S.Ct. at 2531.
 
 
 10
 RICO's private civil remedies are authorized by Sec. 1964(c), which provides:
 
 
 11
 Any person injured in his business or property by reason of a violation of Section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover three fold the damages he sustains and the cost of the suit, including a reasonable attorney's fee.
 
 
 12
 Section 1962(c), the substantive provision that plaintiffs' claim was violated here, provides:
 
 
 13
 It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.
 
 
 14
 Congress has carefully defined for us some of the unfamiliar terms it used:
 
 
 15
 "[E]nterprise" includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity. Sec. 1961(4).
 
 
 16
 "[R]acketeering activity" means [any of a large number of specified acts which are chargeable under state law, indictable under federal law, or constitute an offense under federal bankruptcy, securities, or drug laws]. Sec. 1961(1).
 
 
 17
 "[P]attern of racketeering activity" requires at least two acts of racketeering activity [within a ten year period]. Sec. 1961(5).
 
 
 18
 When these provisions and definitions are applied to the instant complaint, it is apparent that plaintiffs have sufficiently alleged those facts required by the statutory language--that they were injured in their business and property by the conduct of the defendants, who violated Sec. 1962 by conducting the enterprise's affairs through a pattern of racketeering activity. The alleged pattern of racketeering activity was a repeated use of the mails and the wires, in furtherance of defendants' underlying scheme to defraud plaintiffs by concealing from them, until the last possible moment, the true conditions for the sale of Bruns.
 
 
 19
 The court below, however, construed the phrase "by reason of a violation of Sec. 1962", contained in Sec. 1964(c), as requiring plaintiffs to allege "something more" than injury from defendants' predicate acts of mail and wire fraud. The "something more" was characterized as a "separate, distinct racketeering enterprise injury". The two recent decisions by panels of this court referred to at the beginning of this opinion address this same issue and essentially agree with the district court in this case. In Sedima, S.P.R.L. v. Imrex Co., a divided panel of this court held that, in order to state a civil RICO claim, a plaintiff must allege a "racketeering injury" which it defined as including an "injury different in kind from that occurring as a result of the predicate acts themselves". 741 F.2d at 496. The panel identified such an injury as one "caused by an activity which RICO was designed to deter." Id. More specifically, it held that this type of injury occurs only where "mobsters", either through legitimate or illegitimate businesses, "cause systemic harm to competition and the market, and thereby injure investors and competitors." Id. at 495-96.
 
 
 20
 In Bankers Trust Co. v. Rhoades, another divided panel of this court held that a civil RICO claim requires an allegation of some kind of "proprietary injury" caused by defendant's use of a pattern of racketeering activity in connection with a RICO enterprise, as opposed to an injury caused merely by the individual racketeering acts. The panel concluded that, without an allegation of this "distinct RICO injury", a civil RICO complaint is legally insufficient. 741 F.2d at 516. In addition to this circuit's recent decisions, some district courts have imposed a similar restriction on civil RICO, sometimes in the form of a "standing" requirement, e.g., Dakis on behalf of the Dakis Pension Plan v. Chapman, 574 F.Supp. 757, 761 (N.D.Cal.1983); Barker v. Underwriters at Lloyd's London, 564 F.Supp. 352, 358 (E.D.Mich.1983); Johnsen v. Rogers, 551 F.Supp. 281, 284-85 (C.D.Cal.1982); Harper v. New Japan Securities International, Inc., 545 F.Supp. 1002, 1007-08 (C.D.Cal.1982); Alton v. Alton, No. 82 Civ. 0795, slip op. at 5-6 (S.D.N.Y. July 9, 1982), Landmark Savings & Loan v. Loeb Rhoades, Hornblower & Co., 527 F.Supp. 206, 208-09 (E.D.Mich.1981), but other district courts have rejected such a restriction, see, e.g., Wilcox v. Ho-Wing Sit, 586 F.Supp. 561 at 568-69 (N.D.Cal.1984); Ralston v. Capper, 569 F.Supp. 1575, 1580 (E.D.Mich.1983); Mauriber v. Shearson/American Express, Inc., 567 F.Supp. 1231, 1240-41 (S.D.N.Y.1983); Seville Industrial Machinery Corp. v. Southmost Machinery Corp., 567 F.Supp. 1146, 1157 (D.N.J.1983); Eisenberg v. Gagnon, 564 F.Supp. 1347, 1352-53 (E.D.Pa.1983); Windsor Associates, Inc. v. Greenfeld, 564 F.Supp. 273, 278-79 (D.Md.1983).
 
 
 21
 To us, the language of Sec. 1964(c) is clear. It contains no requirement for a "racketeering enterprise injury"; nor does it limit the protected injury to one sustained "by reason of" the racketeering enterprise; it grants civil relief for "injury", which logically includes any injury, "by reason of a violation of Sec. 1962".
 
 
 22
 Despite the clarity of congress's language, defendants argue that, since RICO's primary purpose is to eradicate organized crime, it is directed only against "racketeers" such as hoodlums and thugs, and not against businessmen engaged in "garden variety fraud", as alleged in this case. However, defendants and others who advocate this position ignore the larger purposes of RICO. While RICO's primary focus may have been on organized crime, when considering the statute congress also recognized that fraud is a pervasive problem throughout our society, see Statement of Findings and Purpose, Organized Crime Control Act of 1970, 84 Stat. 922-23 (1970); Blakey, The RICO Civil Fraud Action in Context: Reflections on Bennett v. Berg, 58 Notre Dame L.Rev. 237, 245-48 (1982), which causes billions of dollars in economic loss each year. Id. at 342-48. Congress further acknowledged that existing state and federal law was not capable of dealing with this problem. United States v. Turkette, 452 U.S. at 586, 101 S.Ct. at 2530.
 
 
 23
 Thus, in order to deter and help eliminate fraud from interstate commerce, congress included in its Sec. 1961(1) definition of predicate acts of racketeering activity not only criminal activity which had formerly been "within the police power of the State", thereby essentially federalizing certain specific state crimes, id. at 586-87, 101 S.Ct. at 2530 (citing legislative history), but also the common federal crimes of fraud, such as mail fraud, wire fraud, bankruptcy fraud and securities fraud. Congress was well aware that in so doing, it was altering the federal-state balance in these areas, elevating "garden variety" common law fraud claims to the status of federal offenses, and subjecting violators to enhanced criminal penalties and severe civil remedies. Id. Since congress unquestionably had the power to do this, "the courts are without authority to restrict the application of the statute." Id. at 587, 101 S.Ct. at 2530 (citation omitted). Yet, restriction is precisely what some courts, like defendants and the court below, seek to impose through an artificial standing requirement on plaintiffs who seek relief under Sec. 1964(c).
 
 
 24
 Further, the statute is not aimed at "racketeers"; indeed, the word "racketeer" is not used in the statute except in its title. Instead, it is aimed at "racketeering", and even then only in the context of "racketeering activity", which congress has defined carefully and precisely in terms of conduct. When congress provided severe sanctions, both civil and criminal, for conducting the affairs of an "enterprise" through a "pattern of racketeering activity", it provided no exception for businessmen, for white collar workers, for bankers, or for stockbrokers. If the conduct of such people can sometimes fairly be characterized as "garden variety fraud", we can only conclude that by the RICO statute congress has provided an additional means to weed that "garden" of its fraud.
 
 
 25
 It seems almost too obvious to require statement, but fraud is fraud, whether it is committed by a hit man for organized crime or by the president of a Wall Street brokerage firm. As we view RICO, fraud by anyone, when furthered by multiple use of the mails, constitutes a "pattern of racketeering activity". And when that pattern is used to conduct the affairs of an "enterprise", congress intended to provide the victims with the private civil RICO remedies of treble damages and attorney's fees for all injuries caused by the defendant's conduct.
 
 
 26
 By construing the "by reason of" language to require more than injury resulting from the predicate acts, courts simply assume that congress could not have intended to provide treble damages and attorney's fees to persons "whose only injury stems directly from the predicate acts." Harper v. New Japan Securities International, Inc., 545 F.Supp. at 1007; see also Johnsen v. Rogers, 551 F.Supp. at 285; Landmark Savings & Loan v. Loeb Rhoades, Hornblower & Co., 527 F.Supp. at 208-09. As a practical matter, however, the only injury suffered by an injured party in most cases will flow from the predicate acts; the enterprise is merely the means or vehicle through which those acts are accomplished. To require injury to result from "something more" than the predicate acts is to sterilize civil RICO as a weapon against the conduct congress sought to curtail.
 
 
 27
 Moreover, it is not true that absent a "racketeering enterprise injury" a claim under Sec. 1964 represents no more than a claim brought under the statutes which define the predicate acts. United States v. Forsythe, 560 F.2d 1127, 1135 (3d Cir.1977); cf. Johnsen v. Rogers, 551 F.Supp. at 285; North Barrington Development, Inc. v. Fanslow, 547 F.Supp. 207, 211 (N.D.Ill.1980); Harper v. New Japan Securities International, Inc., 545 F.Supp. at 1007-08. What distinguishes a civil RICO claim from an ordinary fraud claim is that RICO requires a "pattern of racketeering activity" (two acts within 10 years) used to conduct the affairs of an "enterprise." See United States v. Forsythe, supra. The existence of the "enterprise" is a sine qua non of a RICO claim, and "at all times remains a separate element which must be proved", United States v. Turkette, 452 U.S. at 583, 101 S.Ct. at 2528. By requiring "proof of a fact other than the facts required to prove the predicate acts of racketeering", Bennett v. Berg, 685 F.2d at 1060, RICO transforms conduct that is already criminal under other statutes into a federal RICO crime with its severe maximum penalties of 20 years in prison and a $25,000 fine. Similarly, with equal force, and for the same deterrent purpose, the statute transforms ordinary common law fraud claims into federal civil RICO claims, with enhanced remedies of treble damages and attorney's fees.
 
 
 28
 Those district courts, like the one below, which have dismissed complaints for failure to allege a separate and distinct "racketeering enterprise injury", have not provided guidance as to what constitutes such an injury. See Ralston v. Capper, 569 F.Supp. at 1580. One court has posited that a "racketeering enterprise injury" might occur "if a civil RICO defendant's ability to harm the plaintiff is enhanced by the infusion of money from a pattern of racketeering activity into the enterprise." Landmark Savings & Loan v. Loeb Rhoades, Hornblower & Co., 527 F.Supp. at 209. But this example does little to define a "racketeering enterprise injury", and it does even less in terms of limiting the statute's reach, because almost every defendant's ability to inflict harm on a plaintiff would be enhanced by the fruits of the racketeering activity. It follows then that almost every complaint that alleges a Sec. 1962 violation and a concomitant injury would satisfy this test. The difficulty in understanding or even defining a "racketeering enterprise injury" is more fully demonstrated in Part III of Judge Cardamone's dissenting opinion in Bankers Trust Co. v. Rhoades, 741 F.2d at 522-23
 
 
 29
 Defendants and others have decried the use of RICO in "far-reaching civil contexts" where it has the potential to "tarnish the reputations" of ostensibly legitimate businesspersons. We are unmoved by the argument. By defining "racketeering activity" in functional rather than status terms, congress sought to avoid serious constitutional hazards. If defendants are surprised or offended that their "garden variety" fraudulent conduct is now statutorily characterized as "racketeering", they should address their grievance to congress, which clearly and specifically included mail, wire, and securities frauds as predicate acts of "racketeering activity" under Sec. 1961(1). See also Blakey, supra, at 268-70. Since such conduct is more frequently associated with "white collar" crime than with "organized crime", as those terms are generally used in the everyday world, we conclude that congress wanted RICO to reach, among other illegal conduct, precisely those kinds of activities that are at issue in this case.
 
 
 30
 The legislative history of Title IX does not support a contrary interpretation of the statute. When it enacted RICO, congress was on notice that the statute had potentially far-ranging effects. Some members of the house who opposed the statute argued:
 
 
 31
 Title IX * * * seeks to stymie organized crime's growing infiltration of legitimate business.
 
 
 32
 But it runs amuck. It embodies poor draftsmanship, and it employs penalties and investigative procedures which are both abusive and pregnant with the potential for abuse.
 
 
 33
 H.R.Rep. No. 1549, 91st Cong., 2d Sess., reprinted in 1970 U.S.Code Cong. & Ad.News, 4007, 4081 (dissenting views of Reps. Conyers, Mikva, and Ryan); see also 116 Cong.Rec. 35204-05 (1970) (remarks of Rep. Mikva). Despite this opposition, however, congress chose to enact the statute as written, and we would exceed our proper function were we to rewrite its provisions in order to restrict its application. United States v. Turkette, 452 U.S. at 587, 101 S.Ct. at 2530.
 
 
 34
 A few courts have seized upon references to antitrust law in RICO's legislative history, specifically to Sec. 4 of the Clayton Act, 15 U.S.C. Sec. 15, which contains language similar to that in Sec. 1964(c), as evidence that congress, in enacting RICO, intended to impose proof requirements on RICO plaintiffs similar to those imposed on antitrust plaintiffs. See Johnsen v. Rogers, 551 F.Supp. at 285; Landmark Savings & Loan v. Loeb Rhoades, Hornblower & Co., 527 F.Supp. at 208-09. While RICO's legislative history does contain some references to antitrust principles, attempts to impute the restrictive standing requirements of antitrust law to RICO, based on similar language in both statutes, are flawed.
 
 
 35
 Section 4 of the Clayton Act, 15 U.S.C. Sec. 15, enables a person "injured in his business or property by reason of anything forbidden in the antitrust laws [to recover treble damages] and the cost of suit, including a reasonable attorney's fee." To recover under this provision, "antitrust injury" must be proved, which is "injury of the type antitrust laws were intended to prevent and that flows from that which makes defendant's acts unlawful." Brunswick Corp. v. Pueblo Bowl-O-Mat, 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1971).
 
 
 36
 Relying on this language in Brunswick, some courts have required that a plaintiff demonstrate a distinct RICO injury in order to state a civil RICO claim. See Johnsen v. Rogers, 551 F.Supp. at 285 (plaintiff must allege "a commercial injury caused by the conducting of an 'enterprise's affairs through a pattern of racketeering activity.' "); Harper v. New Japan Securities International, Inc., 545 F.Supp. at 1007 (plaintiff must allege "injury of the type the RICO statute was intended to prevent"); Landmark Savings & Loan v. Loeb Rhoades, Hornblower & Co., 527 F.Supp. at 208. (although RICO does not require a competitive injury as that term is defined by antitrust cases, plaintiff must allege a "racketeering enterprise injury").
 
 
 37
 But the antitrust analogy has several defects. While RICO copied the treble damages and attorney's fee language of Sec. 4, this was simply "another example of the antitrust remedy being adapted for use against organized criminality." 116 Cong.Rec. 35295 (1970) (remarks of Rep. Poff); see also Note, Civil RICO: The Temptation and Impropriety of Judicial Restriction, 95 Harv.L.Rev. 1101, 1112 (1982). Moreover, these concepts that were borrowed from the Clayton Act, treble damages and injunctive relief, pertain to remedies rather than what is necessary to establish a claim under RICO.
 
 
 38
 Senator McClellan, one of the sponsors of the bill, stated:
 
 
 39
 There is, however, no intention here of importing the great complexity of antitrust law enforcement into this field. Nor is there any intention of using the antitrust laws for a purpose beyond the legislative intent at the time of their passage.
 
 
 40
 The many references to antitrust cases are necessary because the particular equitable remedies desired have been brought to their greatest development in this field, and in many instances they are the primary precedents for the remedies in this bill.
 
 
 41
 115 Cong.Rec. 9567 (1969).
 
 Senator Hruska echoed these remarks:
 
 42
 Patterned closely after the Sherman Act, [RICO] provides for private treble damage suits, prospective injunctive relief, discovery procedures and all the other devices which bring to bear the full panoply of our antitrust machinery in aid of the businessman competing with organized crime.
 
 
 43
 115 Cong.Rec. 6993 (1969).
 
 
 44
 Moreover, the Antitrust Section of the American Bar Association argued against a proposal which would have amended the Sherman Act to provide for civil RICO remedies, and instead recommended the enactment of separate statutes, contending that the use of antitrust laws to combat organized crime.
 
 
 45
 could create inappropriate and unnecessary obstacles in the way of persons injured by organized crime who might seek treble damage recovery. Such a private litigant would have to contend with the body of precedent--appropriate in a purely antitrust context--setting strict requirements on questions such as "standing to sue" and "proximate cause."
 
 
 46
 115 Cong. Rec. 6995 (1969).
 
 
 47
 This recommendation, adopted by congress, recognized that the application of antitrust commercial injury standing requirements would not be appropriate in the RICO context. Kimmel v. Peterson, 565 F.Supp. 476, 494 (E.D.Pa.1983).
 
 
 48
 Antitrust law has very little relevance to RICO, as each area of law serves different purposes. "Congress did not see the objectives of RICO and theantitrust laws as coterminous." Bennett v. Berg, 685 F.2d at 1059. Antitrust regulation is designed to promote market place competition and is increasingly focused on market efficiency rather than harm suffered by individual businesses. See, e.g., Continental T.V., Inc. v. GTE Sylvania Inc., 433 U.S. 36, 53 n. 21, 97 S.Ct. 2549, 2559 n. 21, 53 L.Ed.2d 568 (1977); Schacht v. Brown, 711 F.2d at 1358; Ralston v. Capper, 569 F.Supp. at 1580. RICO, on the other hand, is not concerned with either market efficiency or promoting competition, but instead is designed to inflict severe financial injury on those who commit crimes in operating an enterprise or who use an enterprise to insulate themselves from less severe penalties. See 115 Cong. Rec. 9567 (remarks of Sen. McClellan); Note, supra, at 1112-14.
 
 
 49
 As Judge Posner of the Seventh Circuit has noted, "analogies to Section 4 of the Clayton Act are forced", Cenco Inc. v. Seidman & Seidman, 686 F.2d 449, 457 (7th Cir.), cert. denied, 459 U.S. 880, 103 S.Ct. 177, 74 L.Ed.2d 145 (1982). Still another court has observed:
 
 
 50
 [RICO] is precisely designed to ruin those individuals and enterprises it is aimed at. It is not designed to increase their efficiency or protect them from insolvency. Thus, the rationale behind the antitrust standing concerns have [sic] no applicability here.
 
 
 51
 Ralston v. Capper, 569 F.Supp. at 1580 (citation omitted).
 
 
 52
 Standing in antitrust cases has been strictly limited in order to confine treble damages to extreme situations and to avoid ruining violators and reducing market place competition. However, because RICO's essential aim is to strip violators of "the fruits of [their] ill-gotten gains", United States v. Turkette, 452 U.S. at 585, 101 S.Ct. at 2530; see also 115 Cong. Rec. 602 (1970) (remarks of Sen. Hurska), such concerns are not present under RICO.
 
 
 53
 In short, a limitation of RICO standing to those who suffer a "racketeering enterprise injury", whether based on similar language in antitrust laws, analogous antitrust concepts, or merely a judicial desire to restrict the statute's scope, not only would run counter to the intent expressed by congress when it enacted RICO, but also would "lead to the anamolous result of denying standing to direct victims of racketeering activity." Seville Industrial Machinery Corp. v. Southmost Machinery Corp., 567 F.Supp. at 1157. As Judge Duffy of the Southern District of New York has pointed out:
 
 
 54
 A brokerage enterprise infiltrated by organized crime and engaged in defrauding its customers * * * might injure no one but the customers of the enterprise. There would be no injury above and beyond that caused by the predicate acts of fraud forming the "pattern of racketeering activity." Such conduct, however, would violate RICO and would lie near the center of Congress' concern. In addition, Sec. 1964(c) simply provides that "any person * * * injured by reason of a violation of Sec. 1962" may invoke RICO's civil remedies. I can imagine no construction of those words which would exclude from their coverage the primary victims of such a scheme and which would render such defendants immune from civil sanctions.
 
 
 55
 Mauriber v. Shearson/American Express, Inc., 567 F.Supp. at 1240.
 
 
 56
 While it may appear that congress, by enacting RICO, has "created a runaway treble damage bonanza for the already excessively litigious", Schacht v. Brown, 711 F.2d at 1361, congress has also spoken in clear and unambiguous terms. Although RICO is a complex statute, we find it to have been carefully drafted, and congress knowingly adopted provisions of potentially far-reaching application. Efforts by various courts across the country to restrict the statute's application seem to be based more on "judicial discomfort with the broad sweep of RICO", Kimmel v. Peterson, 565 F.Supp. at 493 n. 21, than on a close reading of the statute's language or an accurate study of its legislative history. We think that any restriction of RICO along the lines urged by defendants must come from congress, not the judiciary. It is not our proper role to superimpose additional requirements for establishing a RICO claim on what is a clearly delineated statutory cause of action. As the Seventh Circuit concluded in Schacht:
 
 
 57
 The legislature having spoken, it is not our role to reassess the costs and benefits associated with the creation of a dramatically expansive, and perhaps insufficiently discriminate, tool for combating organized crime. United States v. Turkette, 452 U.S. at 586-87, 101 S.Ct. at 2530-31 (1981).
 
 
 58
 711 F.2d at 1361.
 
 
 59
 We therefore think that the district court erred when it dismissed plaintiffs' complaint for failing to allege a "separate, distinct racketeering enterprise injury".
 
 
 60
 As an alternative ground for dismissal, defendants below moved to compel arbitration of plaintiffs' claims, based on an arbitration clause in the partnership agreement. Although the district court did not rule on that part of defendants' motion, plaintiffs now urge us to hold that their civil RICO claims are not subject to arbitration. Since we are compelled to uphold the dismissal of plaintiffs' complaint, we do not have to reach this issue.
 
 CONCLUSION
 
 61
 The judgment of the district court is affirmed on the authority of Sedima, S.P.R.L. v. Imrex Co. and Bankers Trust v. Rhoades.